**324**

Norman LAW, et al., Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, Defendant.

William Hall, Plaintiff,

v.

National Collegiate Athletic
Association, Defendant.

Doug Schreiber, et al., Plaintiff,

v.

National Collegiate Athletic
Association, Defendant.

Nos. Civ A 94–2053–KHV, Civ A 94–2392–
KHV, Civ A 95–2026–KHV.

United States District Court,
D. Kansas.

Jan. 15, 1999.

Order Granting in Part Motion to Amend
Judgment, Jan. 15, 1999.

Lori R. Schultz, W. Dennis Cross, Morrison & Hecker L.L.P., Kansas City, MO, Spencer J. Brown, Thomas E. Deacy & Deacy, Kansas City, MO, Gerald I. Roth, Allentown, PA, for plaintiffs.

Linda J. Salfrank, Craig T. Kenworthy, John J. Kitchin, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kansas City, MO, Beverley J. Klein, Howard J. Roin, Alan N. Salpeter, Michele L. Odorizzi, Bradley J. Andreozzi, Mayer, Brown & Platt, Chicago, IL, Alan I. Rothenberg, William J. Meeske, Lathem & Watkins, Los Angeles, CA, William C. Barnard, Gayle A. Reindl, Sommer & Barnard, P.C., Indianapolis, IN, Gregory L. Curtner, Miller, Canfield, Paddock & Stone, P.C., Ann Arbor, MI, Stephen C. Mayer, Mayer & Rosenberg, Kansas City, MO, Priscilla Lord Faris, Faris & Faris, Minneapolis, MN, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on *Post Trial Motions Pursuant To Federal Rules Of Civil Procedure 23, 50 and 59* (Doc. # 852) which the National Collegiate Athletic Association ("NCAA") filed on May 18, 1998. In those motions, the NCAA renews its request for judgment as a matter of law. In the alternative, it asks the Court to remit the damages awarded to each class or vacate the judgments, decertify the classes and order a new trial. The prior proceedings in this case are well documented and for the purpose of the present motions, the Court will not repeat its previous rulings.[1] For reasons stated more fully below, the Court finds that defendant's motions should be overruled.

### Standards of Review

■ Judgment as a matter of law is appropriate under Rule 50(b) of the Federal Rules of Civil Procedure "only if the evidence, viewed in the light most favorable to the nonmoving party, points but one way and is susceptible to no reasonable inferences supporting the nonmoving party." *Riggs v. Scrivner, Inc.*, 927 F.2d 1146, 1149 (10th Cir.), *cert. denied*, 502 U.S. 867, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991). Such judgment is proper only when "the evidence so strongly supports an issue that reasonable minds could not differ." *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir.1987). In determining whether judgment as a matter of law is proper, the Court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *See Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988). Nevertheless, the Court must find more than a mere scintilla of evidence favoring the nonmovant; the Court must find that "evidence was before the jury upon which it could properly find against the movant." *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir.1988).

■ The decision to grant a motion for new trial under Rule 59(a) of the Federal Rules of Civil Procedure is committed to the trial court's sound discretion. *Marsh v. Coleman Co.*, 806 F.Supp. 1505, 1509 (D.Kan. 1992). Motions for new trial are not regarded with favor and are only granted with great caution. *Id.* In considering a motion for new trial, the Court must view the evidence in the light most favorable to the prevailing party, *Neyman v. United Telecomms., Inc.*, No. 90–2033–O, 1992 WL 97808 (D.Kan. April 7, 1992), *aff'd*, 1 F.3d 1249 (10th Cir.1993), and should not grant the motion unless prejudicial error has occurred or substantial justice has not been done. *Miller v. City of Mission, Kansas*, 516 F.Supp. 1333, 1337 (D.Kan.1981). Moreover, the Court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S.

---

1. For detailed information regarding the facts and proceedings in this action, see the Court's *Memorandum And Order* (Doc. # 103) filed July 25, 1995, sustaining plaintiffs' motion for summary judgment (reported as *Law v. National Collegiate Athletic Ass'n*, 902 F.Supp. 1394 (D.Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir.), *cert. denied*, — U.S.——, 119 S.Ct. 65, 142 L.Ed.2d 51 (1998)); the *Memorandum And Order* (Doc. # 815) filed April 20, 1998, overruling defendant's motion for partial summary judgment (reported as *Law v. National Collegiate Athletic Ass'n*, 5 F.Supp.2d 921 (D.Kan.1998)); and the *Memorandum And Order* (Doc. # 814), filed April 17, 1998, overruling defendant's motion to decertify classes.

548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

## Analysis

The NCAA seeks judgment as a matter of law, claiming a generalized failure of proof as to the fact of injury and amount of damages. This argument can be rejected out of hand because at trial the NCAA admitted some liability as to each of the classes. Perhaps anticipating this flaw in its position, the NCAA also seeks judgment as a matter of law as to specific categories of damages: (1) for any given year, damages for class members whose compensation was below the salary cap imposed by the restricted earnings rule ("the Rule"); (2) damages for class members whose compensation was above the salary cap; (3) damages incurred after the NCAA rescinded the Rule; (4) damages for class members for whom plaintiffs' expert, Dr. Robert D. Tollison, made no individualized findings; (5) damages incurred after May 25, 1998, when the NCAA claims that it withdrew from the conspiracy; (6) damages suffered by coaches who did not return class questionnaires; and (7) damages for restricted earnings coaches who got their jobs because the Rule had forced their predecessors out of position, i.e., coaches allegedly benefitted rather than harmed by the Rule. Also in the alternative, the NCAA asks that the Court set aside the jury verdict and order a new trial because the verdict was contrary to the manifest weight of the evidence and resulted from faulty jury instructions and evidentiary rulings. The NCAA also reasserts its arguments on the class certification issue. Finally, the NCAA requests a remittitur (before trebling) to $117,390 in *Schreiber,* $297,263 in *Law,* and $442,376 in *Hall.*[2]

The Court has previously rejected many of these arguments, in orders dealing with summary judgment, decertification and motions in limine. *See Memorandum And Order* (Doc. # 815) filed April 20, 1998 (reported as *Law v. National Collegiate Athletic Ass'n,* 5 F.Supp.2d 921 (D.Kan.1998) (overruling defendant's motion for partial summary judgment)); *Memorandum And Order* (Doc. # 814) filed April 17, 1998 (overruling defendant's motion to decertify classes); and *Memorandum And Order* (Doc. # 822) filed April 23, 1998 (overruling defendant's motion in limine to exclude opinion of plaintiffs' expert on fact of injury). These rulings—be they good, bad or indifferent—constitute the law of the case. Some of the prior rulings addressed novel legal issues on which precedent is conflicting or altogether lacking, but the Court has addressed the issues fully and to the best of its ability. Reargument does not persuade the Court of error, or of any need for further discussion. As to issues previously addressed, the Court stands on the record and does not further elaborate.[3]

---

**2.** The request for a remittitur appears in the NCAA's *Brief In Support Of Post Trial Motions* (Doc. # 853) at 3. The NCAA offers no argument or authority to justify this request but simply cites closing argument where defense counsel entreats the jury, "when you're all finished, after your deliberations, please ... do not award more than ... these amounts of money." Tr. 3836. Plaintiffs oppose the request for a remittitur, arguing that the Court should exercise its discretion to reduce an award of damages only where the verdict is so plainly excessive that it shocks the conscience and it is reasonable to infer that the award was the product of bias, passion or prejudice. *See Sheets v. Salt Lake County,* 45 F.3d 1383, 1390 (10th Cir.1995); *Moore v. Subaru of America,* 891 F.2d 1445, 1451–52 (10th Cir.1989). The verdict in this case is not plainly excessive and it is not reasonable to infer that it was the product of bias, passion or prejudice. *See* discussion, *infra.* Moreover, the damage analysis which the NCAA asked the jury to adopt was inherently implausible, on any number of grounds. Even if the Court were otherwise in-

clined to grant a remittitur, it could not endorse the NCAA calculations in good conscience. Those calculations reflect the work of Dr. John Umbeck, the NCAA expert whose testimony was inherently untenable in many respects. The jury astutely concluded as much. The Court agrees and overrules the NCAA's request for a remittitur.

**3.** The Court does not further discuss the NCAA's request for judgment as a matter of law as to specific categories of damages, class certification or issues under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As to the allegation that the NCAA has no liability for damages which plaintiffs sustained after the date of its alleged withdrawal from the conspiracy, the Court draws counsel's attention to *United States v. Gonzalez,* 797 F.2d 915, 916–17 (10th Cir.1986) ("Once any conspirator commits ... an overt act, the crime of conspiracy is complete; and no member of the conspiracy can withdraw from that crime. Effective withdrawal is limited to future crimes the

**328**

## I. Proof of Fact of Injury and Amount of Damages

The NCAA claims that on a classwide basis, plaintiffs failed to prove fact of injury or the amount of damages. In support of that position, the NCAA argues that (1) the Court committed reversible error when it allowed Dr. Tollison to take the witness stand; (2) the Court erred in refusing to strike Dr. Tollison's totally new opinion that the Rule "touched" or "nicked" all class members who worked as restricted earnings coaches ("RECs") between 1992 and 1997; and (3) Dr. Tollison's analysis was "hopelessly circular" and thus insufficient to sustain a verdict. The NCAA's first point is a re-argument of issues raised in its motion under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court has already rejected those arguments, *see Memorandum And Order* (Doc. # 822) filed April 23, 1998, and the NCAA's post-trial assignment of error does not warrant relief. Without further elaboration on that issue, the Court addresses the NCAA's two remaining arguments.

### A. Motion to strike Dr. Tollison's testimony

On the afternoon of April 14, 1998, Dr. Tollison testified without objection that the NCAA's antitrust conspiracy "touched" or "nicked" any coach who worked as a restricted earnings coach between 1992 and 1997. Tr. 1615. The following day, on the morning of April 15, 1998, Dr. Tollison testified that "it's not hard to see the evidence of the impact of the rule." Tr. 1639. The NCAA objected that said testimony was beyond the scope of Dr. Tollison's expert report, but the Court overruled that objection and the NCAA did not move to strike his testimony. At the close of the day on April 16, 1998— two days after Dr. Tollison's testimony that the Rule "touched" or "nicked" any coach who worked as a restricted earnings coach

between 1992 and 1997 (and indeed after Dr. Tollison had left the jurisdiction of the Court)—the NCAA made an oral motion to strike all testimony by Dr. Tollison. In doing so it incorporated all reasons previously stated in its *Daubert* motion and stated other reasons which consumed six full pages of trial transcript. Tr. 2243–48. This multi-faceted objection included an argument that Dr. Tollison "offered a new opinion, that because the market wasn't free, all were touched."

As noted above, the NCAA argues that it is entitled to judgment as a matter of law or a new trial because the Court erred in overruling its motion to strike Dr. Tollison's opinion that the Rule "touched" or "nicked" all class members. Dr. Tollison rendered that testimony on April 14, 1998. The NCAA first objected and moved to strike on April 16, 1998. "A contemporaneous objection must be made when evidence is offered at trial in order to preserve for appeal the issue of admissibility, for only by timely objection can the trial court avoid error." *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir.1993) (citing *McEwen v. City of Norman, Oklahoma*, 926 F.2d 1539, 1544 (10th Cir.1991) ("[i]n recognition of the broad discretion vested in the trial court, evidentiary rulings made over contemporaneous objection will be upheld on appeal unless they constitute an abuse of discretion.")). *See also United States v. Nathan*, 127 F.3d 1110 (table; text available in Westlaw at 1997 WL 659420, at *4) (10th Cir.1997) (evidentiary objections must generally be made at time evidence is offered) (citing cases).[4]

In the absence of a timely and proper objection, the alleged error cannot be raised on appeal unless "it constitutes plain error resulting in manifest injustice." *United States v. Norman T.*, 129 F.3d 1099, 1106, *cert. denied*, —— U.S. ——, 118 S.Ct. 1322, 140 L.Ed.2d 485 (1998) (citations omitted).

---

remaining conspirators might commit.") (footnote omitted).

4. Under the Federal Rules of Evidence, error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and "a timely objection or motion to strike appears of record, stating the specific ground of the objection, if the specific ground was not apparent from the context;" however, "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." Rule 103(a)(1), (d), Fed.R.Evid.

*See also McEwen,* 926 F.2d at 1545 (citing Rule 103(a)(1), (d), Fed.R.Evid.). The "plain error" exception in civil cases is limited to errors which seriously affect the "fairness, integrity or public reputation of judicial proceedings." *Id.* (citations omitted).

▇▇▇ The NCAA's objection and motion to strike did not preserve any error. At the time Dr. Tollison testified to his "new opinion," the NCAA should have reasonably known that the objection was available. Its failure to contemporaneously object deprived plaintiffs of the opportunity to respond and the Court to undertake further inquiry. Moreover, for reasons which follow, admission of the challenged testimony did not materially affect the fairness, integrity or public reputation of the judicial proceedings. Consequently the "plain error" exception does not apply.

The NCAA seeks judgment as a matter of law or a new trial because Dr. Tollison's testimony was a "new opinion" that was flatly inconsistent with his pretrial opinion and testimony on cross-examination, to the effect that many RECs sustained no damages. If Dr. Tollison's testimony was internally inconsistent, however—and the Court does not agree that it was—that fact was a matter for the jury to consider in evaluating his opinion. The jury was not required to adopt the NCAA's view of Dr. Tollison's testimony and its failure to do so does not entitle the NCAA to relief.

More importantly, the NCAA's argument does not fairly characterize Dr. Tollison's testimony, which was neither new nor unsupported. As plaintiffs correctly point out, Dr. Tollison stated in his reports, declarations and testimony at the *Daubert* hearing that the NCAA had engaged in the exercise of monopsony power, singled out the class of RECs in order to extract salary concessions, and levied its superior bargaining power against them. *See, e.g., Declaration of Robert D. Tollison* (January 19, 1998), ¶ 8 ("economic theory and common sense suggest that plaintiff coaches were in a radically different bargaining environment after the imposition of the restrictions so that there is every reason to predict that RECs earning less than $12,000 were impacted by these restrictions"); ¶ 9 ("it is entirely possible that coaches [hired] after May 25, 1995, and who were paid more than $12,000 were injured by the REC compensation limitations"); *Declaration of Robert D. Tollison* (April 3, 1997), ¶ 9 ("[t]he effect of this enhanced bargaining power was levied against all RECs in their individual negotiations with their schools") (emphasis in original), ¶ 10 ("[a]ll REC wages were subject to a new bargaining environment in which bargaining power had shifted significantly to schools"), and ¶ 14 ("[i]n this world all coaches arguably suffered damages as a result of the rule. And if they did not suffer damages, my model will not find damages."). *See also Memorandum And Order* (Doc. # 822) filed April 23, 1998 (overruling defendant's motion in limine to exclude opinion of plaintiff's expert on fact of injury); *Memorandum And Order* (Doc. # 815) filed April 20, 1998 (reported as *Law v. National Collegiate Athletic Ass'n,* 5 F.Supp.2d 921 (D.Kan.1998) (overruling defendant's motion for partial summary judgment)).

While the NCAA challenges the sufficiency of Dr. Tollison's trial testimony, it mainly reiterates arguments previously advanced in support of its motion for partial summary judgment and its motion in limine to exclude Dr. Tollison's testimony, and during the *Daubert* hearing. The NCAA again argues that Dr. Tollison's methodology is flawed, that he merely assumes fact of injury and damages, and that his opinion regarding causation has no adequate basis in fact. The NCAA also argues that because plaintiffs chose to rely solely on Dr. Tollison to prove fact of injury, it is entitled to judgment as a matter of law. The NCAA's real complaint appears to be with the jury, which obviously and for good reason attached more credence to Dr. Tollison's testimony than it did to the testimony of the NCAA's expert, Dr. John Umbeck.[5] As the Court has previously noted, the case presented a classic battle of the experts, a battle in which the jury must

---

5. Perhaps understandably, the NCAA's brief on this point makes only passing reference to Dr. Umbeck. Defendant's critique of Dr. Tollison's methodology comes straight from the mouth of Dr. Umbeck, however, and it is one which the jury in substance rejected.

decide the victor. *See Jenkins v. United States*, 307 F.2d 637, 646 (D.C.Cir.1962).

Moreover, plaintiffs did not rely solely on Dr. Tollison to establish fact of injury. Testimony of head coaches, class members, Dr. Umbeck and other witnesses revealed that the Rule caused generalized decreases in REC salaries, that NCAA member institutions were concerned that salaries would spike upward when the NCAA rescinded the Rule, and that salaries indeed did increase after that point. *See, e.g.*, Tr. 347, 716, 1439–42, 2407–09, and 2771. In addition, the so-called Gilardi chart, Plaintiffs' Exhibit 77, and three other similar charts (Plaintiffs' Exhibits 78, 79 and 80) confirmed the macroeconomic effects of the Rule. *See* Tr. 1365–97.

The NCAA takes special aim at the Gilardi chart, arguing that it shows only that the Rule forced highly compensated coaches out of the Division I coaching market and allowed member institutions to replace them with lower-paid individuals. At most, according to the NCAA, the Gilardi chart reinforces its so-called "substitution theory" and does not demonstrate that class members suffered any diminution of income on account of the Rule.[6] The Gilardi chart was subject to other interpretations, however, especially when considered in the light of other evidence.

The jury was entitled to reject the NCAA's interpretation and to infer from the Gilardi chart that after the Rule went into effect, member institutions paid lower salaries for REC positions than they previously had paid.

In summary, Dr. Tollison's testimony was neither new nor unsupported, and the NCAA is not entitled to a new trial or to judgment as a matter of law because the Court let him testify that the NCAA's antitrust conspiracy "touched" or "nicked" any coach who worked as a restricted earnings coach between 1992 and 1997.

### B. Sufficiency of the evidence

The NCAA argues that "the same flaws that made Dr. Tollison's testimony legally insufficient to prove fact of injury also made that formula insufficient to prove a reasonable estimate of the amount of damages." The NCAA devotes less than one page to its attack on the damage calculations. It does not suggest any flaw in the jury's damage calculations, other than the fact that Dr. Tollison influenced them. The NCAA does not suggest that the jury was in any respect obligated to accept the damage calculations of *its* expert, nor does it suggest what amount of damages—other than the damages proposed by Dr. Umbeck—the jury should

---

**6.** This "substitution theory," which is aptly described as "theory" rather than a proven fact of general applicability to the plaintiff classes, provided the platform for the NCAA's argument that the Rule *benefitted* RECs by creating job vacancies that otherwise would not have existed and that RECs had no standing to complain about mere loss of compensation when—but for the good graces of the NCAA—they would have lacked jobs. As defense counsel stated otherwise, in antitrust lingo, "[i]f new people came in that were happy to work for $7,000 or $10,000 or $12,000 or $15,500, there's no adverse impact" and defendant was entitled to judgment as a matter of law. Tr. 2002–04.

This theory of defense, which was not anchored in established case law, ignored the fact that before the Rule went into effect, the market established competitive salaries for the positions which later became restricted. The effect of the rule, and indeed its very purpose, as established by the summary judgment record, was to inhibit the effect of those free market forces—whether by reducing the compensation of existing coaches *or by forcing them out* and creating entry level positions for new coaches. The record contains

no evidence that plaintiff RECs were less accomplished than their predecessors or that passage of the Rule worked any change in REC job responsibilities. Dr. Tollison testified that no major environmental factors other than the Rule could have caused the salary patterns revealed by the evidence. On such evidence the jury was entitled to find that the Rule prevented RECs from earning that compensation which the free market had previously established as competitive wages for their positions. The fact that RECs agreed to work for less than competitive wages does not mean that they were (in the NCAA's words) "happy" about it or that the Rule caused them no injury.

Viewing the evidence in the light most favorable to plaintiffs, the record shows that the Rule injured *both* those highly paid coaches who had to quit their positions because of the salary cap and those less highly paid coaches who succeeded them. On these facts, it does not matter why the latter got their jobs or how long they had held them; regardless of why the jobs were created or how recently the RECs had been employed, they were entitled to work in a market that was not infested with a conspiracy to violate the federal antitrust laws.

have awarded. The Court finds that Dr. Tollison's opinion, along with the other evidence of record, is sufficient to support the jury verdict with respect to fact of injury and that the NCAA's argument does not occasion further inquiry into the amount of the damage awards. Although the Court cannot recreate the jury's deliberative process, that situation is far from unique to this case. It is evident that the jury awarded only such damages as it found had been proven, and nothing in the NCAA argument convinces the Court that the jury's assessment of damages resulted from mere speculation or conjecture.

In short, the jury verdict is supported by much more than a scintilla of evidence. It reflects a thoughtful and critical evaluation of the evidence, after a long and well-fought trial, and the Court is satisfied that it is amply supported by the record.[7] Accordingly, the NCAA's motion for judgment as a matter of law or a new trial must be overruled.

## II. The Jury Instructions Correctly Stated the Applicable Law

The NCAA argues that it is entitled to judgment as a matter of law or a new trial because the Court delivered "a series of jury instructions ... that effectively removed the individual issues from the case by eviscerating plaintiffs' burden of proof." The Court has previously rejected the NCAA argument that class certification and other pretrial rulings eviscerated the requirement that plaintiff prove fact of injury and improperly allowed the jury to *presume* fact of injury. The Court does not further address those contentions.

In further support of its motion, the NCAA argues that the instructions (1) denied the NCAA a fair trial by instructing the jury "in grim detail" that the NCAA had committed an antitrust violation and pelting the jury with prejudicial terms like "unlawful" and "anticompetitive" and other "loaded terms"; (2) improperly instructed the jury on

multiple causes; (3) forced the jury to consider only academic year compensation; (4) improperly invited the jury to award damages for NCAA rules that plaintiff did not challenge; (5) allowed the jury to award damages on behalf of persons who were not even class members; (6) defined Division I as the relevant market when even plaintiffs would not do so; (7) improperly added a subjective "good faith" element to the instruction on withdrawal; (8) improperly gave instructions 9, 11, 12, 13, 14, 16, 17 and 21; and (9) utilized a defective verdict form.

### A. "Grim detail" instructions

At the beginning and the end of the three-week trial,[8] the Court summarized the history of the case and the issues which had been resolved, so that jurors could understand what issues remained for decision. The NCAA attacks those pre-trial and post-trial instructions, complaining that the Court denied it a fair trial by instructing the jury "in grim detail" that the NCAA had engaged in illegal activity and "repeatedly us[ing] inflammatory terms like 'wrongful,' 'unlawful,' 'conspiracy,' and 'violation' to describe the Rule and the NCAA." The NCAA does not (and cannot) deny that it engaged in illegal activity when it conspired with member institutions to violate the federal antitrust laws, and that the Court was at least accurate when it so instructed the jury. The NCAA apparently argues, however, that the Court breached its duty to sanitize the subject and that its failure to do so "prevented the jury from fairly assessing the issues of injury and damages that were before it, and denied the NCAA a fair trial." No authority for this proposition appears in the NCAA's 144-page brief.

Rule 56(d), Fed.R.Civ.P., states that if summary judgment is rendered on part but not all of the case and a trial is necessary, the court shall ascertain what material facts exist without substantial controversy and what matters are actually and in good faith

---

7. In closing arguments plaintiffs' counsel asked the jury to return verdicts of $14,947,722 in *Law*, $2,106,820 in *Schreiber*, and $12,648,257 in *Hall*. The jury returned verdicts which totalled exactly 75% of the amount requested for each class:

$12,210,791 in *Law*, $1,580,115 in *Schreiber*, and $9,486,192 in *Hall*.

8. The trial lasted 16 days, starting on April 6, 1998 and ending on April 28, 1998.

controverted. Rule 56(d) further directs that "[u]pon the trial of the action the facts so specified shall be deemed established, and trial shall be conducted accordingly." In this case, the Court told the jury what matters had been established without substantial controversy on the summary judgment record. The Court was required to do so not just by Rule 56, but by the fact that the proceedings in this case had been bifurcated. This bifurcation, which had the blessing of all parties, meant that the Court first decided whether the NCAA had violated the antitrust laws and then decided whether plaintiffs were entitled to damages on account of the violation. This bifurcation involved a considerable overlap between two issues: whether the Rule had an anticompetitive effect (an issue which this Court and the Tenth Circuit Court of Appeals answered affirmatively in the first phase of the trial) and whether plaintiffs sustained antitrust injury (an issue which the jury had to decide in the second phase of the trial).

The NCAA offers no adequate suggestion as to how—*without* the use of so-called "loaded" language—the Court might have discharged its duty under Rule 56(d) and instructed the jury what material facts existed without substantial controversy and what matters were actually and in good faith controverted. It would make no sense to ask the jury to assess antitrust damages without telling it that an antitrust violation had occurred, or to instruct the jury how to evaluate the testimony of co-conspirators without using the term "conspiracy." The duty of fairness stops somewhere short of a duty to pretend that a violation of federal antitrust law is a technical foul like a lane violation, an illegal substitution, excessive celebration, or failure to tuck in a jersey. If the NCAA had had its way, the Court would have instructed the jury that the Rule was unlawful but not told it why, leaving the NCAA free to prove that the Rule was not anticompetitive but was benign in both purpose and effect. This option was foreclosed by the partial summary judgment in favor of plaintiffs.[9]

## B. Causation instructions

█ The NCAA argues that the Court erred in instructing the jury on "multiple causes," *see* Instructions 18, 20 and 21, because plaintiffs' theory was that "but for the REC Rule, they would have earned more."[10]

---

9. The NCAA complains that "telling the jury the outcome of the summary judgment proceeding deprived the NCAA of the key benefit it would have derived from a unitary trial: being able to put all of its evidence and all of its arguments before the jury." The fact is, however, that very early on, the NCAA consented to bifurcation. It cannot consent to bifurcation and simultaneously be heard to complain that the Court denied it the key benefits of a unitary trial.

10. Instruction 18 instructed the jury, in relevant part, that in order to prevail, plaintiffs must prove that the Rule was "a material cause of some of their injury." It continued as follows:

> [Y]ou may conclude as a matter of just and reasonable inference from the proof of defendant's antitrust violation and its tendency to injure plaintiffs in their business or property, and from any evidence of a decline in the compensation of restricted earnings coaches which is not shown to be attributable to other causes, that the NCAA's wrongful act caused injury to members of the class. Under this test, so long as injury to the class was widespread, the fact that certain class members may have escaped injury altogether would not defeat a finding that members of the class suffered injury.

> Causation is established if the Rule played a substantial part in bringing about or actually

causing injury in the business or property of class members and the injury was either a direct result or a reasonably probable consequence of the Rule. This does not mean that the law recognizes only one cause of injury, consisting of only one factor or thing or the conduct of only one person. On the contrary, many factors or things, or the conduct of two or more may operate at the same time, either independently or together, to cause injury, and, in such a case, each may be a cause.

Instruction 20 stated as follows:

> The term "by reason of," as used in Instruction No. 18, refers to causation. Plaintiffs must establish that as a matter of fact and with a fair degree of certainty, the Rule was a material cause of some of their injury. They need not prove that the Rule was the sole or exclusive cause of their injury, and they are not required to rule out all possible alternative sources of injury. It is enough that the Rule contributed substantially to plaintiffs' injury, even if other factors amounted in the aggregate to a more substantial cause. Plaintiffs must prove, however, that but for the Rule, they would not have sustained injury in their business or property.

Instruction 21 stated in relevant part as follows:

> Plaintiffs have the burden of proving the amount of damages which were proximately

According to the NCAA, the Rule was either the sole cause of plaintiffs' injury or it was no cause at all, and the Court erred in failing to so instruct the jury. This argument is not faithful to either the law or the facts in this case. Plaintiffs did not need to prove that the Rule was the sole cause of their injury. *E.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Also, because plaintiffs proved that the Rule had a generalized anticompetitive effect which tended to depress compensation across the board, the jury was entitled to consider that fact along with evidence that within the non-competitive market, other factors also had a bearing on individual compensation levels.

## C. Academic year compensation

In Instruction 15, the Court advised the jury of plaintiffs' claim that because of the Rule, "they lost academic year compensation." [11] The NCAA argues that this instruction "pulled the rug out" from under its claim that the jury should base its verdict on calendar year compensation, because it failed to instruct the jury to do so and erroneously described the cap as $12,000 rather than $16,000. These arguments are frivolous. Instruction 15 did not tell the jury how to decide anything; it summarized the claims of the respective parties and told the jury who had the burden of proof. The NCAA offered no credible evidence in support of its johnny-come-lately hypothesis that the Rule set a unitary cap of $16,000 per year rather than a $12,000 cap for the academic year and a

$4,000 cap for summer compensation. Even if it had done so, Instruction 15 contains no reference to a $12,000 cap. The Court correctly instructed the jury that plaintiffs only sought compensation for academic year losses. The NCAA argued (and presented evidence) that certain summer compensation was disguised academic-year compensation that was intended to evade the Rule. This argument raised a factual issue which was vigorously litigated and properly submitted to the jury—albeit without an instruction that the jury must resolve it in favor of the NCAA. In that regard, however, Instruction 15 did not err.

## D. NCAA rules that plaintiffs did not challenge

The trial transcript in this three-week case includes passing references to NCAA rules other than the restricted earnings rule. The NCAA cites less than ten such references but it claims that they required the Court to give its tendered Instructions 13 through 24, and that the Court's failure to do so invited the jury to award damages for NCAA rules that plaintiffs did not challenge. This argument, to borrow plaintiffs' words, is utterly without substance or merit. The instructions left no doubt that the jury was to award damages for the NCAA's imposition of the *restricted earnings* rule. To suggest that the jury awarded damages on account of other rules is an insult to the intelligence of the jury and is an accusation which is totally unsupported by the record. The Court did not err in refusing to give the NCAA's in-

caused by the conspiracy. Once plaintiffs have proved by a preponderance of the evidence that the Rule was a material cause of some of their injury, however, their burden of proving damages is to some extent lightened.

\* \* \*

Proximate cause is established if the Rule played a substantial part in bringing about or actually causing the damage and the damage was either a direct result or a reasonably probable consequence of the Rule. This does not mean that the law recognizes only one proximate cause of damage, consisting of only one factor or thing or the conduct of only one person. On the contrary, many factors or things, or the conduct of two or more persons, may operate at the same time, either independently or together, to cause damage; and in such a case, each may be a proximate cause.

11. Instruction 15 stated in relevant part as follows:

This instruction sets forth the claims of the parties. The claims are not evidence in the case, but rather must be proved by the evidence in the case.

Plaintiffs claim ... that they lost academic year compensation that they would have received if the Rule had not been adopted; ... and that they are entitled to recover from the NCAA their damages for lost academic year compensation beginning August 1, 1992, when the Rule went into effect.

Plaintiffs have the burden of proving by a preponderance of the evidence that their claim are more probably true than not true.

The NCAA denies plaintiffs' claims.

structions on matters which were sufficiently, and more clearly, addressed by the Court's own instructions.

### E. Damages on behalf of persons who were not even class members

In another affront to the intelligence of the jury, the NCAA argues that Instruction 19 invited the jury to award damages for coaches who were not class members.[12] This argument is spurious. The instructions told the jurors that they could award damages *for class members* and told them who the class members were. The record contains no suggestion that the jury found fact of injury or awarded damages to anyone other than class members, and the NCAA's argument must be rejected.

### F. Definition of relevant market

The NCAA attacks Instructions 18 and 19 because they "amounted to a directed finding that Division I constitutes a 'relevant market,'" in that they "told the jury to disregard evidence that numerous class members had employment opportunities outside of Division I that enabled them to mitigate their damages, and to uncritically accept plaintiffs' po-

sition that such opportunities were undesirable."[13] This argument can be summarily rejected. First, Instructions 18 and 19 addressed the question whether plaintiffs had sustained economic injury on account of the Rule; they did not deal with the subject of mitigation, much less tell the jury that employment opportunities outside of Division I are undesirable and should not be considered on the subject of mitigation. Also, the jury did not have to decide whether Division I was a "relevant market" under federal antitrust law. When the Court used that term it did not invade the province of the jury or direct any findings on that issue. The NCAA's argument on this subject is without merit.

### G. "Good faith" element to the instruction on withdrawal

The NCAA argues that the Court should have instructed the jury not to award damages after May 25, 1995, when it withdrew from the conspiracy. *See* Defendant's Proposed Post–Trial Instruction 26. In the alternative, the NCAA argues that in giving Instruction 23, the Court created a "novel subjective test, telling the jury that 'withdrawal must be complete and in good faith.'"[14] The NCAA also attacks Instruc-

---

**12.** Instruction 19 stated as follows:

> Since the purpose of the antitrust laws is the prevention of restraints to free competition in business and commercial transactions, the term "injury in their business or property" is given a naturally broad and expansive meaning which includes injury in plaintiffs' competitive positions, that is, in their ability to earn a competitive wage as coaches in Division I sports at NCAA member institutions.
>
> You are instructed that plaintiffs have been injured in their "business" if you find that they have suffered injury to any of their commercial interests or enterprises. You are further instructed that a person whose money has been diminished has been injured in his or her "property"; therefore plaintiffs have been injured in their "property" if you find that their compensation was artificially reduced by reason of the Rule. Loss of employment or the opportunity to seek employment is included within the meaning of the term "business or property."
>
> The term "injury in business or property" does not include personal injuries such as emotional distress or humiliation.

**13.** Instruction 18 stated in relevant part as follows:

> The law permits you to find that members of the class suffered some injury in their business or property if you find that:
> (1) the members of the conspiracy were able to effectuate the conspiracy;
> (2) compensation for restricted earnings coaches in Division I sports experienced generalized decreases, to below competitive levels, while the Rule was in effect; and
> (3) the NCAA and its members dominated or controlled the market for such coaching services.

Instruction 19 provided in pertinent part as follows:

> Since the purpose of the antitrust laws is the prevention of restraints to free competition in business and commercial transactions, the term "injury in their business or property" is given a naturally broad and expansive meaning which includes injury in plaintiffs' competitive positions, that is, in their ability to earn a competitive wage as coaches in Division I sports at NCAA member institutions.

**14.** Instruction 23 stated as follows:

> The NCAA claims that it withdrew from the conspiracy on May 25, 1995. In order for you to find that the NCAA withdrew from the conspiracy, it must prove that the following are more probably true than not true:

tion 23 on the ground that it repeatedly used "the loaded and unjustified [sic] term 'conspiracy.'" The NCAA further attacks Instruction 8, claiming that it implies that NCAA members were agents of the NCAA during and after the conspiracy period, when it should have told the jury that they were *not* NCAA agents "in any actions inconsistent with the NCAA's cancellation of the REC Rule." [15]

These objections are without merit. First, whether the NCAA withdrew from the conspiracy, and when, were disputed factual issues. The Court could not property instruct the jury to credit either side of the evidence on this point and it did not err in failing to instruct the jury that it should not award damages after the NCAA withdrew from the conspiracy on May 25, 1995. Second, the good faith requirement of withdrawal is not unsupported in pattern instruction and precedent. *E.g., United States v. Wilson,* 134 F.3d 855, 863 (7th Cir.1998); *United States v. Bullis,* 77 F.3d 1553, 1562 (7th Cir.1996); *United States v. Varah,* 972 F.2d 357 (table; text available in Westlaw at 1992 WL 186530, *3) (10th Cir.1992); *United States v. Andrus,* 775 F.2d 825, 850 (7th Cir.1985); *United States v. Diaz,* 662 F.2d 713, 717 (11th Cir. 1981); *United States v. Continental Group, Inc.,* 603 F.2d 444, 466 (3d Cir.1979). Finally, Instruction 8 properly told the jury that the NCAA, as a voluntary association, could act only through its officers, agents and employees acting within the scope of their authority. Whether NCAA members acted on behalf of the NCAA when they continued the conspiracy after May 25, 1995 was a question for the jury and the instructions properly communicated the legal standards to be applied to that analysis.

**H. Instructions 9, 11, 12, 13, 14, 16, 17 and 21**

The NCAA challenges Instruction 9, complaining that it "confused and misled the jury into believing that the twenty-five [plaintiff] witnesses who came to court were truly representative of the thousands of remaining class members." [16] Instruction 9 is an accurate statement of the law, however, and the NCAA's objection to it is nonsensical.

The NCAA attacks Instruction 11, arguing that it "compounded the prejudice of the Court's exclusion of certain charts submitted by the NCAA ... while admitting similarly founded charts submitted by plaintiffs." [17]

1. That beginning May 25, 1995, the NCAA engaged in conduct which was inconsistent with the object of the conspiracy; and
2. That the NCAA acted in a manner reasonably calculated to notify co-conspirators that it was no longer participating in the conspiracy.

Mere inactivity is not proof of withdrawal, nor is a mere change of policy. Furthermore, even if defendant may tell others of its intention to withdraw, it has not withdrawn if it continues to act in furtherance of the object of the conspiracy. Withdrawal from a conspiracy requires affirmative action which disavows or defeats the purpose of the conspiracy, by communication of the abandonment in a manner reasonably calculated to reach co-conspirators. The withdrawal must be complete and in good faith.

**15.** Instruction 8 provided as follows:

You are instructed that defendant, the National Collegiate Athletic Association, is a voluntary association, rather than a natural person, and thus it can act only through its officers, agents, and employees. Therefore, whenever mention is made of the NCAA doing or not doing something, then of course it means defendant or any of its officers, agents

or employees, acting within the scope of their authority.

You are also instructed that the NCAA, even though a voluntary association, is entitled to the same fair and impartial consideration as an individual under like circumstances.

**16.** Instruction 9 stated as follows:

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial. Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in the case.

**17.** Instruction 11 stated as follows:

Certain charts and summaries have not been received into evidence, but have been shown to you in order to help explain the facts disclosed by the testimony of witnesses and the books, records, and other documents which are in evidence in the case. Such charts or summaries not in evidence are not in and of themselves evidence or proof of any facts. If such charts or summaries do not correctly reflect facts or figures shown by the evidence in the case, you should disregard them.

This objection is incomprehensible, given that the NCAA does not claim that it incorrectly stated the law. Nor does it identify how the instruction "compounded" the Court's evidentiary errors or tell us what charts the NCAA has in mind when it lodges this attack. A new trial is not warranted on this ground.

The NCAA also criticizes Instruction 12,[18] arguing that it "undermined" Defendant's Exhibit 659 when it correctly reminded the

In other words, such charts or summaries are used only as a matter of convenience; so if, and to the extent that you find they are not in truth summaries of facts or figures shown by the evidence in the case, you are to disregard them entirely.

18. Instruction 12 stated as follows:

Some evidence has been received for only a limited purpose, and you must consider it for that limited purpose and no other. Those exhibits are as follows:

*Plaintiffs' Exhibit 103 and Defendant's Exhibit 659:* Plaintiffs' Exhibit 103 and Defendant's Exhibit 659 reflect salary data and other information which Dr. Tollison and Dr. Umbeck relied upon in formulating their opinions in this case. These exhibits were received into evidence because they may assist you in understanding and evaluating the testimony of Dr. Tollison and Dr. Umbeck. However, the data in these exhibits has not necessarily been established through the testimony of any witness who has appeared in court, under oath, to vouch that it is true. Except to the extent that the data has been verified in court, through witnesses, deposition testimony or other evidence which the Court has received into evidence, it is hearsay. To that extent, you may not consider Exhibit 103 or Exhibit 659 as evidence that the underlying data is true, or use it for any purpose other than to assist you in understanding the testimony of Dr. Tollison and Dr. Umbeck.

*Plaintiffs' Exhibit 12:* Plaintiffs' Exhibit 12 is the NCAA compliance file which concerns the Rule which is at issue in this case. Plaintiffs offered this file into evidence to show how NCAA members perceived the binding effect of the Rule. The Court received it for that limited purpose, but as with Exhibits 103 and 659, the information in the file has not necessarily been established through the testimony of any witnesses who appeared in court, under oath, to vouch that it is true. Except to the extent that such information has been verified in court, through witnesses, deposition testimony or other evidence which the Court has received into evidence, it is hearsay and you may not consider the file as evidence that the information contained in it is true, or use it for any purpose other than what I have instructed.

jury that unless the data in Defendant's Exhibit 659 had been verified in court, through witnesses, deposition testimony or other evidence which the Court had received into evidence, it was hearsay and could not be considered as evidence that the underlying data was true. This and the remaining objections to Instruction 12 are frivolous and are rejected.

The NCAA next disparages Instruction 13,[19] on the ground that it "injected the

19. Instruction 13 stated as follows:

As I mentioned at the beginning of the case, effective August 1, 1992, the NCAA enacted a rule which limited the annual compensation of certain assistant coaches. In this case we have referred to this rule as the "restricted earnings rule" or simply "the Rule." The Court has certified the three cases as class actions, which means that the named individual plaintiffs bring suit not only on their own behalf, but also on behalf of all other coaches in the classes. The classes in this. case consist of all persons who were employed on a paid basis as restricted earnings coaches in NCAA Division I programs on or after August 1, 1992. The *Law* class consists of restricted earnings coaches in the sport of men's basketball. The *Schreiber* class consists of restricted earnings coaches in the sport of men's baseball. The *Hall* class consists of restricted earnings coaches in all other sports.

Plaintiffs in the three cases claimed that the NCAA conspired with its members to reduce salary competition in the market for coaching positions in Division I sports. Specifically, they challenged the Rule's limit on compensation under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, which prohibits any unlawful "contract, combination ... or conspiracy, in restraint of trade." Under the law, a conspiracy may consist of any mutual agreement or arrangement, knowingly made, between two or more competitors. To prevail on a Section 1 claim under the Sherman Act, the coaches needed to prove that the NCAA (1) participated in an agreement that (2) unreasonably restrained trade. The parties did not dispute the first element, the existence of an agreement. Therefore the Court had to decide whether the Rule was an unreasonable restraint of trade. In resolving this issue, the Court determined that the Rule unreasonably restrained trade because it had a substantially adverse effect on competition, that is, that there was an agreement to fix salaries, the agreement was effective, and that the salaries set by the agreement were more favorable to NCAA members than otherwise would have resulted from the operation of competitive market forces. The Court then examined whether the procompetitive benefits of the Rule justified the anticompeti-

purpose of the REC Rule into the case, and then incorrectly stated that the purpose was cost-cutting," then "compounded the error by stating the cost-cutting was not sufficiently pro-competitive, and therefore that the REC Rule was illegal." According to the NCAA, the jury was entitled to consider "the fact that the REC Rule was intended to create new entry level coaching positions," which was itself relevant to show "why so few class members actually had their salaries reduced when the REC Rule came into effect." While this argument may make sense to the NCAA, it has never cited a single case or statute for the proposition that its state of mind in enacting the Rule (benevolent or otherwise) tells us *anything* about who sustained damages, or why. The Court did not err in giving the jury a 60-second tutorial to the effect that the Court had determined that (1) the Rule unreasonably restrained trade because it had a substantially adverse effect on competition, that is, that there was an agreement to fix salaries; (2) the agreement was effective; (3) the salaries set by the agreement were more favorable to NCAA members than otherwise would have resulted

from the operation of competitive market forces; and (4) the procompetitive benefits of the Rule (including cost-cutting) did not justify the anticompetitive effects, so that the Rule on balance was reasonable.

The NCAA also attacks Instruction 14 [20] because while it defined the burden of proof, it did not state which party had the burden of proof. This argument, again, is frivolous. Instruction 15, among others, recited plaintiffs' claims and instructed that the NCAA denied plaintiffs' claims and that plaintiffs had the burden of proving by a preponderance of the evidence that their claims were more probably true than not true.

The NCAA challenges Instruction 16 [21] on the ground that it misstated plaintiffs' burden of proof. The Court has previously addressed and rejected the argument that the jury was required to find fact and amount of damage for each individual class member, and the remaining objections to Instruction 16 are without merit.

The NCAA complains that Instruction 17 [22] "exacerbated the Court's fundamental error

---

tive effects, so that the Rule on balance was reasonable. The Court rejected the NCAA's argument that cost-cutting was a valid procompetitive justification under federal antitrust law, and held that the Rule did not have procompetitive benefits which outweighed its anticompetitive effects. Therefore the Court concluded that the Rule was illegal under federal antitrust law.

We have now completed the second phase of the trial. Your job is to decide whether the Rule caused injury to plaintiffs and if so, the amount of damages which they should recover. At this point you should not be concerned with the reasons why the Rule was enacted, or whether the NCAA enacted the Rule in a good faith belief that it would not violate the federal antitrust laws. A conspiracy to fix prices is unlawful, even though the conspiracy may be formed or engaged in for what may appear to the conspirators to be laudable motives. A conspiracy cannot be justified under the federal antitrust laws, for example, even though the conspiracy may have been formed or engaged in to prevent ruinous competition. A claim of good motives, like a claim of ignorance of the law, cannot justify or excuse a violation of the federal antitrust laws, and so would be no defense in this case. Your sole job is to examine the effect of the Rule, to decide whether the Rule caused injury to plaintiffs and if so, to what extent.

20. Instruction 14 stated as follows:

Burden of proof means burden of persuasion, and is sometimes referred to as establishing something by a preponderance of the evidence. Parties who have the burden of proof on any issue must persuade you that their claims are more probably true than not true. In determining whether a party has met this burden, you will consider all the evidence, whether produced by plaintiffs or by defendant.

The weight of the evidence on any issue is not determined by the number of witnesses, but by how reasonable, persuasive and satisfying the evidence is to you.

21. Instruction 16 stated as follows:

Proof that the NCAA committed an antitrust violation does not afford plaintiffs an automatic right to damages, since such proof establishes only that injury may result and does not mean that plaintiffs have been actually injured. In order to recover damages under federal antitrust law, plaintiffs must establish that they are entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Section 4 provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States."

22. Instruction 17 stated as follows:

Under the law, a person may file suit not only on his or her individual behalf but on

**338**

of allowing plaintiffs to evade their burden of proving injury to individual class members ... and virtually directed the jury to conclude that if some of the class members established that they were injured by the REC Rule, all class members were entitled to damages." This complaint is without merit, as are the remaining objections to Instruction 17.

Finally, the NCAA argues that Instruction 21 [23] erred because it "exaggerated the lightening of plaintiffs' burden on damages," was based on market exclusion cases which are "completely inapposite to this case," and refused to instruct the jury that it must not impose treble damages (the latter instruction being allegedly necessitated by the "many news stories reporting that the damages

> behalf of other persons who are similarly situated, where the class is so large that individual plaintiffs could not practically be joined in one lawsuit, where there are questions of fact and law that are common to the class, where the claims of the named parties are typical of the claims of the class, and the named parties will fairly and adequately protect the interests of the class. As I noted earlier, the Court has allowed all three cases to proceed on a class action basis.
>
> Because plaintiffs have elected to proceed as classes rather than as individual plaintiffs, your verdicts will reflect your judgments concerning the class as a whole. The form of the verdict is not intended to influence your consideration of the evidence in any way and it is not meant to suggest that the evidence must be evaluated only on a class wide basis.

23. Instruction 21 stated as follows:

> If you find that any class of plaintiffs has sustained injury under Instruction Nos. 18 through 20, it is entitled to fair and adequate compensation for the difference between what class members could have earned in a hypothetical free economic market and what they actually earned by reason of the Rule.
>
> Plaintiffs have the burden of proving the amount of damages which were proximately caused by the conspiracy. Once plaintiffs have proved by a preponderance of the evidence that the Rule was a material cause of some of their injury, however, their burden of proving damages is to some extent lightened. Our willingness to accept a degree of uncertainty in fixing the amount of damages rests in part on the difficulty of ascertaining economic damages, in that the vagaries of the marketplace usually deny us sure knowledge about what plaintiffs' situation would have been in the absence of an antitrust violation. For this reason, plaintiffs need not establish the amount

award will be trebled."). As with most of the foregoing objections, the NCAA's arguments are fanciful but ultimately baseless. The objections are without merit and they are summarily overruled.

I. Verdict Form

Finally, the NCAA argues that the verdict form was fatally flawed because it did not require the jury to state whether each individual class member had sustained injury and if so, the amount of damages to be awarded; it used the term "conspiracy;" it failed to state the consequences of withdrawal; it promoted inconsistent verdicts; it failed to mention the burden of proof, and it otherwise "set into stone" errors committed elsewhere in the jury instructions. These

> of their damages with mathematical precision, but need only provide such evidence that the jury is not left to speculation or guesswork in determining the amount of damages. In the absence of precise evidence, you may make a fair and reasonable estimate of damages based on just and reasonable inferences from the facts which you find to be proven about the operation of the Rule, its tendency to injure plaintiffs in their business or property, and any decline in compensation not shown to be attributable to other factors.
>
> Proximate cause is established if the Rule played a substantial part in bringing about or actually causing the damage and the damage was either a direct result or a reasonably probable consequence of the Rule. This does not mean that the law recognizes only one proximate cause of damage, consisting of only one factor or thing or the conduct of only one person. On the contrary, many factors or things, or the conduct of two or more persons, may operate at the same time, either independently or together, to cause damage; and in such a case, each may be a proximate cause.
>
> As I mentioned earlier, when persons enter into a conspiracy, they become agents for each other, and each is liable for the damages which are proximately caused by the conspiracy. As a result, the NCAA is liable for the acts of all conspirators during the course of and in furtherance of the conspiracy. If you find that the NCAA withdrew from the conspiracy on May 25, 1995, it would nonetheless be liable for damages which are the proximate result of the conspiracy. It is not liable, however, for any acts which other members of the conspiracy committed after the NCAA withdrew.
>
> In considering the amount of damages, you are not to consider interest, inflation, costs of suit or attorneys' fees. Plaintiffs' right to such damages is a matter for the Court.

arguments have been addressed elsewhere and they are without merit.

The Court concludes that the jury instructions properly stated the law and that the forms of verdict did not incorporate prejudicial error or deny substantial justice to the NCAA. *Miller v. City of Mission, Kansas,* 516 F.Supp. at 1337. Accordingly, defendant's motion for a new trial based on faulty jury instructions must be overruled.

### III. Evidentiary Rulings

The NCAA argues that the Court committed reversible error (1) when it allowed plaintiffs to "repeatedly" introduce evidence relating to hardships purportedly caused by the Rule; (2) when it allowed plaintiffs to "repeatedly" introduce hearsay evidence of what third parties said about the Rule after the NCAA announced its rescission; (3) when it allowed plaintiffs to "repeatedly" introduce evidence about NCAA rules that had been in effect before the Rule went into effect; (4) when it allowed plaintiffs to introduce hearsay evidence without sufficient foundation concerning average salaries before, during and after the Rule; (5) when it refused to let the NCAA prove that the "rear" purpose of the Rule was not to contain costs but to create entry level positions; (6) when it excluded evidence of amounts which RECs earned after the Rule went into effect; (7) when it excluded the "white notebook" from evidence; (8) when it erroneously precluded the NCAA from introducing the class notice into evidence; and (9) when it excluded evidence during the testimony of Roy Williams.

#### A. Hardship cases

■ The NCAA argues that plaintiffs were not entitled to recover damages for pain, suffering, humiliation, emotional distress or "marital woes," and that the Court therefore erred in allowing eight witnesses to testify how the salary cap hurt them. The NCAA argues that such testimony was of-

fered solely to buy the jury's sympathy and prevented the jury from taking a "reasoned, dispassionate look at plaintiffs' damage claims."

Plaintiffs were required to introduce proof of antitrust injury, however, and that proof necessarily included evidence that adoption of the Rule had financial consequences (sometimes devastating) for those who experienced it firsthand. Some of the witnesses were understandably emotional when they testified about the heavy price they paid to assume or remain in REC positions after the Rule went into effect, or how the Rule had forced them to abandon their chosen professions. In receiving such evidence of tangible economic loss, the Court not only allowed plaintiffs to prove the fact of injury, but also to meet NCAA evidence regarding mitigation and circumvention and to prove the fair market value of REC positions.[24] To the extent that such testimony made reference to pain, suffering, humiliation, emotional distress or "marital woes," it was largely embodied in random remarks and passing references that did not materially affect the fairness of the trial as a whole or cause substantial injustice to the defense. *Miller,* 516 F.Supp. at 1337. Because the Court should ignore errors that do not affect "the essential fairness of the trial," *McDonough Power Equip.,* 464 U.S. at 553, 104 S.Ct. 845, such error—if it was error—does not warrant a new trial or judgment as a matter of law on any claims.

Moreover, to the extent that such evidence was erroneously received, the NCAA invited such error. It opened the door by continued insistence, through counsel and witnesses, that the NCAA had a pure heart when it enacted the Rule to create entry level positions for the benefit of young coaches. In fact, both sides attempted to play off the sympathy of the jury: NCAA witnesses, for their part, told heart-warming stories about how they had overcome obstacles similar to the Rule and had risen through the ranks of

24. This issue became relevant because of the NCAA's position that where the Rule forced a highly paid coach out of position, the Rule *benefitted* the REC who succeeded him or her because it created a job opportunity that otherwise would not have existed. According to the NCAA, the REC in that position had no standing to complain about the money because "[i]f new people came in that were happy to work for $7,000 or $10,000 or $12,000 or $15,500, there's no adverse impact." Tr. 2002–04. The NCAA thus put in issue the question whether plaintiffs were "happy" to work in a market that was fixed by its antitrust conspiracy.

poverty and adversity. The NCAA also insinuated that a damage award against it would only hurt deserving student athletes.[25] Such evidence was irrelevant to this (and perhaps any) phase of the trial. Like plaintiffs' evidence of pain, suffering, humiliation, emotional distress and "marital woes," however, such plays to passion, sympathy and prejudice were too isolated, too brief and too infrequent to have had any material effect on the lengthy trial in this case.

The NCAA also invited any error with respect to pain, suffering, humiliation, emotional distress and "marital woes" when it insisted—under its "substitution theory"—that RECs suffered no adverse impact under antitrust law. The NCAA injected into the trial the legally erroneous argument that "[i]f new people came in that were happy to work for $7,000 or $10,000 or $12,000 or $15,500, there's no adverse impact." Tr. 2002–04. In doing so, it put in issue the question whether plaintiffs were "happy" to work in a market that was fixed by an antitrust conspiracy, and the Court did not err in allowing plaintiffs to counter that argument through proof of emotional distress.

### B. Hearsay evidence of what third parties said about the Rule after May 25, 1995

The NCAA argues that it unequivocally withdrew from the antitrust conspiracy on May 25, 1995 and that the Court erred in admitting evidence to the contrary. At trial the Court made an extensive record with regard to the admissibility of such evidence under Rule 801(d)(2)(e) and Rule 803(3), Fed. R.Evid. The record speaks for itself. The Court is not persuaded of error in its rulings and the NCAA's motion for a new trial on this ground is overruled.

### C. Prior NCAA rules

The NCAA complains that the Court improperly received evidence regarding salary caps that existed before 1992 for basketball and football, because such evidence (1) created the false and irrelevant impression that the NCAA has a habit of imposing improper and burdensome rules on coaches; (2) implied that plaintiffs were somehow entitled to damages for the earlier period; and (3) allowed Dr. Tollison to proclaim that compensation in basketball and football, prior to the Rule, was "fixed." The NCAA does not deny that basketball and football had salary caps even before the Rule went into effect on August 1, 1992, and the jury had to know this fact in order to understand Dr. Tollison's damage calculations, as well as those of Dr. Umbeck. This objection is specious; the challenged evidence was not irrelevant, nor was it prejudicial.

### D. Hearsay evidence concerning average salaries before, during and after the Rule

The NCAA argues that the Court erred in admitting the so-called Gilardi chart, Plaintiffs' Exhibit 77, because plaintiffs did not produce it until the night before trial began; because it represented a new expert opinion and constituted inadmissible hearsay; because it was irrelevant and unduly prejudicial; and because it created a misleading impression that REC salaries had been cut when in fact it merely demonstrated the so-called "substitution effect." This complaint has been exhaustively addressed on the trial record. Given the NCAA's failure to lodge a contemporaneous objection at trial, along with the other facts referenced in plaintiffs' opposition brief, the Court is not convinced of error in regard to the Gilardi exhibit.

---

25. For example, Cedric Dempsey, the Executive Director of the NCAA, testified that he had grown up in a home without electricity or indoor plumbing, surviving on federal food stamps, and that even his position as NCAA Executive Director was a "hardship" on his family. Tr. 1854, 1856, 1988. Dempsey also testified that he had succeeded in the face of a salary cap which was not dissimilar to the Rule. Tr. 1852, 1853–54, 1977–79. He further testified that the majority of money which the NCAA generates goes back to member institutions "to help serve student athletes," Tr. 1870, approximately 24,000 of whom participate in national championships, Tr. 1875, and that the NCAA and its member institutions are "having a very difficult time funding programs." Tr. 1859.

### E. Evidence regarding the "real" purpose of the Rule

The NCAA complains that the Court denied it an opportunity to prove that while the Rule came out of a cost reduction committee, its *primary purpose* was *not* to cut costs but to create entry level coaching positions. As a result, the NCAA contends, it was "unable to prove or argue that the REC rule had worked as *intended* and because it worked as *intended,* the population of RECs after the rule [sic] into effect was primarily entry level, not experienced coaches who took a pay cut or were held down by the REC rule." The Court has never understood this argument and it does not understand it now. The NCAA had ample opportunity to prove that the *effect* of the Rule was to create entry level coaching positions, and the NCAA took full advantage of the opportunity to do so. Whether that effect was intentional, coincidental or otherwise, had absolutely no bearing on any issue that was properly before the jury.

In closing argument, plaintiffs' counsel made the passing comment that the Rule "hurt people, and the people it hurt were the coaches it was aimed at." Tr. 3718. The NCAA apparently construes this comment as a claim that the primary purpose of the Rule was to cut costs or hurt experienced coaches. It therefore argues—even though the comment occurred after both sides had rested their cases—that the NCAA should have been allowed to prove that the primary purpose of the Rule was *not* to cut costs or to hurt experienced coaches but to create entry level coaching positions. The NCAA did not ask to re-open the case to present such evidence from the various NCAA executives and university presidents who appeared on its witness list. And the fact that plaintiffs made this statement in closing did not retroactively open the door to "purpose" evidence at trial.

### F. Amounts which RECs earned after the Rule went into effect

 The NCAA argues that the Court improperly prevented it from introducing "circumvention evidence," principally in the form of hearsay information which Dr. Um-beck gleaned through a mass of telephone calls to athletic directors and university officials at member institutions. The record on this issue is already complete. Suffice it to say that the record contains no evidence that expert economists do the job that Dr. Umbeck purported to do in his damage calculations, much less that expert economists reasonably rely on random telephone calls to athletic directors and university officials to calculate free market wages and damage calculations. *See* Rule 703, Fed.R.Evid. The NCAA basically presented Dr. Umbeck as a channeler, seeking to present non-expert, otherwise inadmissible hearsay through the mouth of an economist.

In *Gust v. Jones,* 162 F.3d 587 (10th Cir. 1998), the Tenth Circuit Court of Appeals noted:

> We previously have held that it is not an abuse of discretion to exclude proffered expert testimony " 'when the normal life experiences of the jury would permit it to draw its own conclusions ..., based upon the lay testimony of eyewitnesses.' " *See Getter v. Wal–Mart Stores, Inc.,* 66 F.3d 1119, 1124 (10th Cir.1995) (citation omitted), *cert. denied,* 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996); *see also Thompson v. State Farm Fire & Cas. Co.,* 34 F.3d 932, 941 (10th Cir.1994) (holding that when expert testimony is offered to explain a question the jury is capable of assessing for itself, the trial court may exclude the testimony because it would not assist the trier of fact).

162 F.3d 587, 594–95. For reasons previously stated, the Court does not believe that it erred in limiting Dr. Umbeck to lay witness stature, insofar as he purported to channel into the jury box his hearsay conversations with athletic directors and university officials.

### G. "The white notebook"

 In discovery, Dr. Umbeck generated a computer printout which contained an individualized analysis of 179 potentially damaged coaches, including their names, ages, coaching histories and income information, calculations whether each was injured and if so, by how much. The printout was approxi-

mately one-fourth of an inch thick. By trial, the NCAA had reinvented Dr. Umbeck's report and it appeared as a shiny white three-ring binder, approximately six inches thick, bursting—literally—with re-formatted information from the original report, and more.[26] The NCAA contends that the altered format made the data more "user-friendly," in that it was alphabetized,[27] included page breaks and tabs between individual coaches, contained detailed summary sheets, set out Dr. Umbeck's notes on a separate page, and had an ample quantity of blank paper in case the jury ran short.[28]

The NCAA complains that the Court erroneously excluded this notebook, Defendant's Exhibit 616, as well as Defendant's Exhibit 616B and alternative submissions which the NCAA offered sequentially, because no rule of evidence requires a party to present its evidence to the jury in the format tendered to the opposing party during discovery. In fact, the NCAA argues, a party is entitled to present evidence to the jury in a way that it believes effectively communicates the evidence.

The Court's scheduling order specifically directed that exhibits not identified and exchanged as required by the order, prior to trial, would not be permitted in evidence, except by agreement of counsel or by order of the Court, or in proper rebuttal. *Fifth Supplemental Scheduling Order* (Doc. # 603) filed December 10, 1997, at 3. The NCAA did not identify and exchange Defendant's Exhibit 616 in accordance with that order and exclusion was therefore proper. Moreover, the fact that the NCAA's preferred format did·not get to the jury did not affect the

essential fairness of the trial, *McDonough Power Equip.*, 464 U.S. at 553, 104 S.Ct. 845, because the jury did receive all of the admissible information contained within the report. The NCAA does not contend otherwise, nor could it, given the fact that the Court received Defendant's Exhibit 616A into evidence.[29] Tr. 2279–80. Therefore, prejudicial error did not occur. *Miller*, 516 F.Supp. at 1337.

In addition, an expert's written report is generally inadmissible. *See, e.g., Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir.1994) ("Rule 702 permits the admission of expert opinion testimony not opinions contained in documents prepared out of court.") (citing Fed.R.Evid.702). Submission of a written expert report to the jury may call undue attention to the expert's trial testimony, and such material should not be admitted if the risk of prejudice substantially outweighs its probative value. *Id.* (citing Fed.R.Evid. 403 and *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1270–71 (7th Cir.1988)). The NCAA's present argument—that no rule of evidence requires that a party's evidence be shown to the jury in the format originally tendered to the opposing party—ignores the fact that in most cases, expert reports do not go to the jury in any format.

H. The class notice

The NCAA complains that the Court's refusal to receive the class notice in evidence deprived it of the opportunity to argue "the obvious inference" that if a class member did not personally submit a claim for money

26. The notebook also contained "a few coaches" that Dr. Umbeck identified after he issued his final report. The Court excluded that information on grounds unrelated to its exclusion of Defendant's Exhibit 616.

27. Upon further inquiry by the Court, NCAA counsel conceded that the original version was in alphabetical order, but complained that the print was very small. Tr. 2273.

28. When the NCAA proffered the exhibit, the Court asked the NCAA to justify the re-invention. Its purported explanations (such as the fact that the notebook contained a separate page for each individual, which made it easier for the jury to

go person by person, Tr. 2275–77) were unsatisfactory and left the Court with the conviction that the sole purpose of the "white notebook" was to draw undue attention to Dr. Umbeck's report by manipulating its size, format, color and tonnage to suggest by its sheer heft and volume that it deserved attention which it might not command in its unadulterated format. Tr. 2208, 2211.

29. Defendant's Exhibit 616A, which the NCAA describes as a "court-imposed alternative," is a printout of the spreadsheet which the NCAA had originally tendered to plaintiffs on a computer disk. Defendant's Exhibit 616A does not include Dr. Umbeck's notes.

damages, "the class member did not believe he or she had been hurt by the REC rule." The Court sustained plaintiffs' objection, agreeing with plaintiffs' counsel that the notice was not relevant and that any potential relevance was outweighed by the danger of unfairly misleading the jury, inasmuch as the record contained no evidence that "anybody, other than the people who returned it, received it." Tr. 3000–01. In addition, the Court believed that without a complicated and lengthy tutorial on class action proceedings, the jury would be unduly confused and perhaps misinterpret the language of the class notice and the consequence of a failure to respond.

In retrospect, the Court remains unconvinced of error. The NCAA did not lay a sufficient foundation to warrant a presumption, arising from evidence that they were properly mailed and placed in the care of the postal service, that the notices were actually received. *Witt v. Roadway Express,* 136 F.3d 1424, 1429–30 (10th Cir.), *cert. denied,* — U.S. ——, 119 S.Ct. 188, 142 L.Ed.2d 153 (1998). Moreover, the fact that the notice was not in evidence did not prevent the NCAA from arguing that class members who failed to return the so-called RECIS forms in fact sustained no injury. Any error in the Court's evidentiary ruling was therefore without material prejudice to the rights of the NCAA.

### I. Roy Williams

The NCAA complains that plaintiffs brought University of Kansas basketball coach Roy Williams to attend oral argument on summary judgment issues in November 1994, in order to influence the outcome of the proceedings, and that plaintiffs again "got away with it" at trial when they "use[d] Coach Williams' celebrity to sway the jury and deflect the jury's attention away from the inherent weaknesses of their case." The NCAA objects that the Court precluded this line of inquiry and excluded documents in which plaintiffs' counsel explicitly embraced a plan to influence the Court through the presence of Coach Williams.

At trial, the Court prohibited the NCAA from offering such evidence. The obvious effect of such evidence was to denigrate the summary judgment ruling on the antitrust violation issue (which the Tenth Circuit had already affirmed) by suggesting that the process which led to the summary judgment order had been corrupted by Coach Williams' presence at the summary judgment argument. Tr. 382, 390. Such evidence was therefore more prejudicial and misleading than it was probative. Moreover, any error in this regard was harmless. Fed.R.Evid. 403. The excluded evidence was not necessary for the NCAA to argue that plaintiffs "brought Coach Williams here to try to influence the jury, and he had very little substantive testimony to give." That argument was not only available to the NCAA; the NCAA in fact made it. Tr. 3775.

### IV. Trial Court Bias

The NCAA argues that the Court "made no attempt to treat the parties equally" and that its manifest bias against the NCAA and its attorneys denied the NCAA a fair trial. This argument rests upon a version of the trial proceedings that is so twisted and one-sided that it does not bear repeating. At trial, the NCAA's counsel did not miss an opportunity to disparage plaintiffs, plaintiffs' witnesses, plaintiffs' counsel, and indeed the Court, with any available "slime factor." Tr. 390. That tactic continues in the recitation of grievances which the NCAA lodges against the impartiality of the judicial process itself, and it is consistent with the contempt and disdain which certain NCAA defense counsel have exhibited throughout the course of these proceedings. The Court will not dignify the NCAA's arguments by further discussion. Because it agrees with the reasoning set forth in *Plaintiffs' Joint Brief In Response To NCAA's Post–Trial Motions,* at 91–97, the Court adopts those arguments by reference as the ruling on this issue.

**IT IS THEREFORE ORDERED** that defendant's *Post Trial Motions Pursuant To Federal Rules Of Civil Procedure 23, 50 and 59* (Doc. # 852) filed May 18, 1998, be and hereby are **OVERRULED** in their entirety.

### *MEMORANDUM AND ORDER NUNC PRO TUNC*

On May 4, 1998, the Court entered judgment in the foregoing cases. *See* Doc. # 839

in *Law,* Doc. # 97 in *Hall,* and Doc. # 46 in *Schreiber.* This matter comes before the Court on *Plaintiffs' Motion To Alter Or Amend Judgments* (Doc. # 848) filed May 15, 1998.[1] Pursuant to Rule 50(e), Fed. R.Civ.P., and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, plaintiffs seek an order which alters or amends the judgments nunc pro tunc by (1) adjusting their damage awards to present value based on the Consumer Price Index, (2) granting permanent injunctive relief, and (3) trebling the judgments under federal antitrust law.

For reasons stated more fully below, the Court finds that plaintiffs' motion should be sustained in part and overruled in part.

## I. Adjustment Of Damage Awards To Present Value Based On Consumer Price Index

■ Plaintiffs ask the Court to adjust the damage awards, using the Consumer Price Index ("CPI") to restore the purchasing power which they lost by virtue of the Restricted Earnings Rule ("the Rule").ᵇ According to plaintiffs, such an adjustment would bring the damage awards to net present value by accounting for inflation and (before trebling) increase the jury verdicts by $842,737.00 in *Law,* $708,669.00 in *Hall,* and $123,944.00 in

*Schreiber.*[2] The National Collegiate Athletic Association ("NCAA") objects to the proposed adjustment on the ground that it equates to prejudgment interest and that plaintiffs have not established grounds for such an award under 15 U.S.C. § 15(a).[3]

The parties agreed that the issue of plaintiffs' entitlement to a CPI adjustment would be bifurcated and tried to the Court after the jury rendered its verdicts on damages. On April 14, 1998, the Court conducted an evidentiary hearing on that issue, outside the presence of the jury. At the hearing, Dr. Tollison explained his CPI calculations and testified that the proposed adjustment is not the same as interest.[4] The Court took under advisement the question whether the proposed CPI adjustment is the functional equivalent of prejudgment interest and is thus awardable only under Section 15(a). The issue is now ripe for decision.

Plaintiffs argue that the adjustment which they seek is not the same as prejudgment interest, citing two Fifth Circuit antitrust cases which allowed net present value adjustments, and note that their method of computing net present value results in a more conservative adjustment than those which the Fifth Circuit approved.[5] The NCAA argues

1. For detailed information regarding the facts and proceedings in this action, see the *Memorandum And Order* (Doc. # 103) entered July 25, 1995, sustaining plaintiffs' motion for summary judgment (reported at 902 F.Supp. 1394 (D.Kan. 1995), *aff'd,* 134 F.3d 1010 (10th Cir.), *cert. denied,* — U.S.——, 119 S.Ct. 65, 142 L.Ed.2d 51 (1998)); the *Memorandum And Order* (Doc. # 815) entered April 20, 1998, overruling defendant's motion for partial summary judgment (reported at 5 F.Supp.2d 921 (D.Kan.1998)); and the *Memorandum And Order* (Doc. # 814) entered April 17, 1998, overruling defendant's motion to decertify classes.

2. The jury awarded each class 75% of the damages which plaintiffs' expert, Dr. Robert D. Tollison, calculated it had sustained. Plaintiffs therefore ask the Court to award each class 75% of the CPI adjustment which Dr. Tollison attributed to it.

Plaintiffs seek an additional adjustment for Mary Beth Spencer Dyson, a member of the *Hall* class. At trial, the parties stipulated that Dyson suffered $32,000.00 in damage as a result of the Rule. Plaintiffs note that because that amount exceeds the damage estimate which Dr. Tollison calculated for Dyson ($18,304.00 without a CPI

adjustment), the total proposed adjustment for the *Hall* class is slightly higher than 75% of Dr. Tollison's figure.

The NCAA attacks plaintiffs' proposal to increase the verdicts by 75% of Dr. Tollison's proposed adjustment, arguing that the jury verdicts covered the classes but that Dr. Tollison applied his CPI adjustment to individual class members. For this reason, according to the NCAA, Dr. Tollison's adjustment cannot be applied across the board to the class verdicts.

3. Plaintiffs do not ask the Court to award prejudgment interest under 15 U.S.C. § 15(a), which authorizes simple interest, if just, under circumstances described later in this order.

4. No other witnesses testified at the hearing.

5. In *Heatransfer Corp. v.. Volkswagenwerk A.G.,* 553 F.2d 964, 986 n. 20 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), plaintiff's damages included $326,-000.00 in interest on a capital value computation. Defendants challenged the inclusion, arguing that as a matter of law, prejudgment interest was not allowable. Plaintiff responded that the figure did not represent interest but was simply a

that plaintiffs' adjustment is prejudgment interest in disguise because "compensation for the loss of use of money is, by definition, interest,"*Southern Pac. Transp. Co. v. United States*, 471 F.Supp. 1186, 1197 (E.D.Cal. 1979), and because Dr. Tollison admits that interest includes an "inflation premium." Tr. 1466, 1469. The NCAA complains that because the Clayton Act would treble an inflation adjustment but not an award of prejudgment interest under Section 15(a), plaintiffs' proposed adjustment would allow them to recover more than the amounts permitted by Section 15(a).[6] The NCAA also argues that because antitrust damages are automatically trebled, any damage award more than compensates plaintiffs for the time value of money and that even if plaintiffs' awards were not fully compensatory, the Clayton Act does not authorize inflation or interest adjustments. More specifically, the NCAA argues that the 1980 amendments to the Clayton Act permit prejudgment interest in only limited circumstances and that even before the 1980 amendments, courts rejected plaintiffs' "full compensation" rationale. *See Locklin v. Day–Glo Color Corp.*, 429 F.2d 873 (7th Cir. 1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).[7]

Congress has not yet provided that prejudgment interest can be awarded as a mat-

means of establishing capital value loss at the date of trial. The district court held that the portion of the damage award which had been labeled "interest" could not be considered improper prejudgment interest. It noted some reservations about the manner in which plaintiff had calculated capital value loss, but declined to grant a remittitur in view of the Fifth Circuit rule that a court may not remit damages below that which a jury might have awarded. On appeal, without explanation, the Fifth Circuit rejected defendant's argument that prejudgment interest is not allowable as a matter of law.

In *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984), plaintiff's expert adjusted the damage estimates to create a net present value for plaintiff's previous injury. Defendant argued that the expert's projections "amount[ed] to nothing more than prejudgment interest, which normally would not be recoverable in an antitrust action." *Id.* at 996 (citing *Volkswagenwerk* and 15 U.S.C. § 15). Relying on *Volkswagenwerk*, the Fifth Circuit held that plaintiff was entitled to recover amounts that its lost profits would have earned in an open investment market. It therefore affirmed the net present value adjustment to the damage award, finding that the claim was based on an economic theory and not on a claim to statutory or common law prejudgment interest. *Id.* at 997.

6. In addition to the fact that the proposed CPI adjustment would be trebled, the NCAA complains that it would cover a greater time period than that permitted under Section 15(a) for the award of prejudgment interest. Under Section 15(a), the Court can only award prejudgment interest from the date of service of plaintiff's antitrust pleading to the date of judgment, or for any shorter period. Here, the date of service is not clear. Plaintiffs filed suit, however, on November 5, 1993, and September 3, 1994 (*Law* and *Hall*) and January 13, 1995 (*Schreiber*), and the Court entered judgment on May 4, 1998 in all three cases. Accordingly, statutory prejudgment interest could not cover a period longer than 40 to 53 months.

Under plaintiffs' theory, the proposed CPI adjustment apparently runs from "the year of damage" for each particular coach, and runs to January 1997, so that damages for each coach are stated in 1997 dollars. Tr. 1456–58. For a coach who was employed when the Rule went into effect on August 1, 1992, the CPI adjustment could span as much as 68 months. For other coaches the time could be a much shorter one. The NCAA does not suggest whether the net outlay under the CPI adjustment would be greater or less than an adjustment that might be allowed for prejudgment interest.

7. In *Locklin*, the Seventh Circuit Court of Appeals affirmed a trial court's refusal to increase antitrust damages to account for "inflationary shrinkage." It found no authority for an adjustment to offset a decrease in the value of the dollar, and—with the single observation that plaintiffs' damages were trebled—rejected the argument that plaintiffs would not receive full compensation without an adjustment for interest. 429 F.2d at 876. In *Hughes*, the Second Circuit agreed. It interpreted congressional silence as a sign that trebled damages would adequately serve the remedial interests of the antitrust laws and noted that "trebled damages will more than adequately compensate [plaintiff] for its injuries." 449 F.2d at 80.

. *See also, Colorado v. Goodell Bros.*, Civ. A. No. 84–A–803, 1987 WL 6771, at *4 (D.Colo. Feb. 17, 1987) (inflation adjustment not allowed in antitrust action where treble damages awarded, citing *Locklin*); *Smith v. Pro–Football, Inc.*, 528 F.Supp. 1266, 1275 (D.D.C.1981) (because of treble damages, prejudgment interest not needed to compensate plaintiff for injuries); and 4 Julian O. von Kalinowski, *Antitrust Counseling and Litigation Techniques* § 42.02[5], pp. 42–8 (Matthew Bender 1993) ("it appears that no adjustment can be made for inflation," citing *Locklin*).

ter of course to private litigants in antitrust suits. Under the 1980 amendments to the Clayton Act, Antitrust Improvements Act, Pub.L. No. 96–349, § 4(a)(1), 94 Stat. 1156 (Sept. 12, 1980), where an antitrust case involves private litigants, plaintiffs' right to prejudgment interest is limited to situations in which a litigant has acted in bad faith to delay the proceedings. *See Fishman v. Estate of Wirtz,* 807 F.2d 520, 561 (7th Cir.1986) (Clayton Act amendments only permit private antitrust plaintiff to recover prejudgment interest if defendant guilty of unnecessary delay). Section 15(a), which codifies the 1980 amendments, provides as follows:

§ 15. Suits by persons injured

(a) Amount of recovery; prejudgment interest

... The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—

(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

(2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

(3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

15 U.S.C. § 15(a).

At the evidentiary hearing on April 14, 1998, Dr. Tollison testified that the Consumer Price Index is a price index constructed by the United States Bureau of Labor Statistics, which samples the prices of goods over time so that adjustments for inflation can be made in indexed government benefit programs and the like. Tr. 1457, 1459. Dr. Tollison proposed a CPI adjustment "to essentially maintain constant purchasing power of the dollar [ ] damages that accrue[d] to the coaches." Tr. 1456–57.

According to Dr. Tollison, interest is a different concept The function of the CPI adjustment is "to reflect changing purchasing power of a dollar ... over time." Interest, on the other hand, is a function of the balance between the supply and demand for loanable funds; it does not represent the "change in the market prices of a bundle of goods,"[8] and it therefore does not "restore coaches to the same purchasing power dollars" they would have enjoyed without the Rule. Tr. 1457, 1459–60, 1466. Dr. Tollison also explained that nominal interest rates (which represent what "most of us think of as the rate if we go to the bank") include not only a "real rate of interest" but an inflation rate of return. The "real rate of interest" represents the productivity of capital, *i.e.,* the pure rate for the use of money. The "inflation rate of return" attempts to capture the anticipated change in purchasing power which results from the fact that "the dollars [the lender is] going to be paid in are worth less than the dollars he lent." Tr. 1462–63, 1465. In this respect nominal interest rates are no different from any other price in the economy: all prices—whether for groceries, bank loans or running shoes—include inflation rates. Tr. 1464, 1466–67.

From Dr. Tollison's testimony that loans in an inflationary economy will be repaid with deflated currency and that nominal interest rates include an inflation rate of return to

---

8. No one asked Dr. Tollison to define what interest *does* represent, but the textbook definition of interest is "the return paid to those who loan money." *Economics* (13th ed.) by Samuelson & Nordhaus (McGraw–Hill 1989).

hedge against future loss due to inflation, the NCAA suggests that CPI and other inflation adjustments are the functional equivalent of simple interest under Section 15(a) and that if plaintiffs were to receive both prejudgment interest and a CPI adjustment, they would be twice compensated for any loss in the purchasing power of the dollar over time. Plaintiffs do not seek prejudgment interest under Section 15(a), however, and the NCAA's concern on this score is unwarranted. The NCAA also argues that in Section 15(a), "Congress has said that that rate which includes cost of living may be awarded if, and only if" the Court finds that defendant acted in bad faith to delay the proceedings. Tr. 1475. Stated otherwise, the NCAA reasons that Section 15(a) authorizes an inflation component which is recoverable *only* as part of prejudgment interest.[9]

The Court is unpersuaded by the NCAA's position. The NCAA cites no authority for its argument that Section 15(a) permits compensation for the decreased purchasing power of the dollar over time, but only in the guise of prejudgment interest. Moreover, the Court is in substantial agreement with the Fifth Circuit decisions in *Heatransfer Corp. v. Volkswagenwerk A.G.* and *Multiflex, Inc. v. Samuel Moore & Co.*, and the dissent of Judge Easterbrook in *Fishman v. Estate of Wirtz*. Losses due to the decreased purchasing power of the dollar represent real losses to plaintiffs. Although the comments of Judge Easterbrook concern the recoverability of prejudgment interest in private antitrust litigation, they are arguably more germane to the issue presented by this case:

> Neither a count of judicial noses nor the observation that the Sherman Act was silent should obscure the fact that the time value of money works in defendants' favor. Antitrust cases can be long-lived affairs. This one has lasted 14 years, 2½ of which passed between the finding of liability and the award of damages. During all of the time, the defendants held the stakes and earned interest. . . . To deny prejudgment interest is to allow the defendants to profit

from their wrong, and because 14 years is a long time the profit may be substantial.

> Is this small beer, to be made up by the trebling of the damages? Hardly. Any erosion of the trebling on account of a denial of interest undermines the deterrent force of the antitrust law. Trebling makes up for the fact that antitrust violations are hard to detect and prove. The acts of the defendants were easy to detect, but the court's rule presumably applies in a cartel case as well. These may be detected only belatedly, and the denial of interest will make trebling much less useful in increasing the damages defendants expect to pay. The expected damages are the deterrent. Today's decision reduces that deterrent. . . . The denial of prejudgment interest systematically undercompensates victims and underdeters putative offenders. We should allow, indeed require, such awards.

807 F.2d at 584.

In this case, plaintiffs would have earned, possessed, spent or invested the compensation which they lost by virtue of the Rule. The Rule effectively forced plaintiffs to invest that compensation with their employers, the member institutions of the NCAA, and they should receive damages which compensate not merely for the fact of nonpayment but also for any demonstrated loss of purchasing power which has resulted from the delay in payment. Trebling may or may not keep pace with inflation; the NCAA does not argue in this case that it has. To deny a CPI adjustment would be to allow the NCAA and its members to profit from a wrong. Because these actions have been pending for four years, the profits of NCAA member institutions have without doubt been substantial. To deny plaintiffs a CPI adjustment would undercompensate them and underdeter the NCAA and other putative offenders.

The Court finds by a preponderance of the evidence presented at the hearing on April 14, 1998, that the CPI adjustment which plaintiffs propose is not merely "interest" in disguise. Consequently, the Court finds that Section 15(a) does not prohibit the requested

---

9. The NCAA apparently argues that the statutory interest authorized in Section 15(a) includes an inflation component, but that fact has not been established as a matter of fact or law.

adjustment without proof of delay and other factors enumerated in the statute. The Court also finds that the proposed adjustment is necessary to fully compensate plaintiffs for losses which they have sustained and that it should be allowed in this case.

The parties waived their right to a jury trial on the CPI issue, and the Court must therefore decide how much of a CPI adjustment to allow. In doing so the Court is guided by familiar rules that govern the award of antitrust damages. In economic terms, plaintiffs are entitled to recover the difference between what they could have made in a hypothetical free economic market and what they actually made in spite of NCAA's anticompetitive activities. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Once an antitrust violation has been established, however, the burden of proving damages is "to some extent lightened." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 568, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). Our willingness to accept a degree of uncertainty in fixing the amount of damages rests in part on the difficulty of ascertaining business damages, in that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Id.* at 566, 101 S.Ct. 1923. Our willingness also rests on the principle that "it does not come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted. *Id.* Therefore damages may be awarded under relaxed rules, on the basis of plaintiffs' damage estimate. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). "In the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused dam-

age to the plaintiffs." [10] *Id.* at 123–24, 89 S.Ct. 1562. Therefore, to establish the amount of injury, plaintiffs need not establish their damages with "mathematical precision." *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242, 246 (10th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). Plaintiffs need only provide such evidence that the factfinder is not left to "speculation or guesswork" in determining the amount of damages to award. *Bigelow*, 327 U.S. at 263–65, 66 S.Ct. 574; *see also Zenith Radio Corp.*, 395 U.S. at 123–24, 89 S.Ct. 1562.

Bearing in mind that the proof necessary to set the amount of damages need not be exact, the Court does not hesitate in finding that each class should be awarded 75% of the CPI adjustment which Dr. Tollison attributed to it. The Court also agrees with plaintiffs' proposed adjustment for Mary Beth Spencer Dyson, a member of the *Hall* class. At trial, the parties stipulated that Dyson suffered $32,000.00 in damage as a result of the Rule. Plaintiffs note that because that amount exceeds the damage estimate which Dr. Tollison calculated for Dyson ($18,304.00 without a CPI adjustment), the total proposed adjustment for the *Hall* class should be slightly higher than 75% of Dr. Tollison's figure.

The Court rejects the NCAA argument that Dr. Tollison's figures are unreliable because, whereas the jury verdicts covered the classes, Dr. Tollison applied his CPI adjustment to individual class members. His methodology does not present an "insuperable problem" because the Court does not agree that "there is no accurate way to translate and apply Dr. Tollison's adjustment to the verdicts." It is obvious to the Court that in its deliberations, the jury conducted a painstaking review of the evidence and in particular the conflicting expert testimony of Dr. John Umbeck (defendant's expert) and Dr. Tollison, concerning the fact and amount of damages. The jury obviously compared Dr. Umbeck's figures to those of Dr. Tollison

---

10. In *Bigelow*, the Supreme Court explained that "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim" and that "[f]ailure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." 327 U.S. at 264–65, 66 S.Ct. 574.

and having done so, concluded that Dr. Tollison's opinion was the weightier and more convincing of the two. The jury gave substantial but not undue weight to Dr. Tollison's figures, discounting them by 25% across the board for each class. It is obvious that in doing so, the jury implicitly found that all class members in each class had suffered antitrust injury and that they were therefore entitled to damages—but not to the extent claimed by Dr. Tollison. Stated otherwise, the jury must have concluded that Dr. Tollison's damage calculations! were too liberal and required a 25% reduction across the board.

The Court does not disagree with anything it can surmise about the jury deliberations in this long, arduous and acrimonious case. As a matter of just and reasonable inference from proof of the NCAA's wrongful acts and their tendency to injure plaintiffs' business, the jury concluded that the NCAA had caused damages that were reasonably estimated at 75% of the level predicted by Dr. Tollison. The Court does not second-guess that conclusion and consequently finds that it is reasonable to award each class 75% of the requested CPI adjustment, as follows:

| | Original Verdict | Proposed CPI Adjustment |
| --- | --- | --- |
| Law | $11,210,791.00 | $842,737.00 |
| Hall | $ 9,486,192.00 | $708,669.00 |
| Schreiber | $ 1,580,115.00 | $123,944.00 |

The damage awards in each case are therefore adjusted to reflect the following totals: $12,053,528 in *Law*, $10,194,861 in *Hall* and $1,704,059 in *Schreiber*.

## II. Permanent Injunctive Relief

Plaintiffs ask the Court to enter a comprehensive order which permanently enjoins the NCAA and its members from future antitrust violations, to restore competition and to "bring home to the NCAA and its members their obligations under the antitrust laws." *Plaintiffs' Joint Memorandum In Support Of Motions To Alter Or Amend Judgments* (Doc. # 849) filed May 15, 1998, at 7 Specifically, plaintiffs ask that each judgment be amended "to include appropriate injunctive relief including but not limited to an order enjoining the NCAA . . . and any person in active concert or participation with them . . . from enacting any restrictions or limitations on the compensation of coaches employed by NCAA member institutions." *Plaintiffs' Motion To Alter Or Amend Judgments* (Doc. # 848) filed May 15, 1998, at 3.

Plaintiffs argue that permanent injunctive relief is appropriate because the jury found that the NCAA did not withdraw from the conspiracy on May 25, 1995, and because the NCAA "has displayed a complete lack of understanding of the seriousness of the antitrust violation involved in this case" and made it clear that it "will modify its unlawful conduct only by as much and for as long as it has to." *Id.* Plaintiffs note that the permanent injunction which the Court entered on January 5 1996, *see* 1996 WL 104328 (D.Kan. Jan. 5, 1996), applied only to *Law* and was limited by its terms to the two representative plaintiffs in that case. Accordingly, plaintiffs ask the Court to enter a more comprehensive injunction in favor of all classes.

In response, the NCAA argues that plaintiffs fail to demonstrate their entitlement to permanent injunctive relief and do not even attempt to satisfy the requirements for issuance of an injunction. Specifically, the NCAA argues that the jury's finding on lack of withdrawal does not satisfy the requirements for such relief, and that any lack of "repentance" is irrelevant. The NCAA also notes that mere proof of a past violation does not justify injunctive relief because an injunction is only available to prevent continuing or future harm. *See e.g., United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

One month after the Court granted permanent injunctive relief to the named plaintiffs in Law, the Court took up the issue in *Schreiber. See Schreiber v. National Collegiate Athletic Ass'n*, 916 F.Supp. 1105 (D.Kan.1996). Relying on the previous injunction order in *Law*, plaintiffs sought an order which permanently enjoined the NCAA from enforcing or attempting to enforce a compensation limitation against named plaintiff Collozzo, the only plaintiff in *Schreiber* who was then employed as a restricted earnings coach. The Court declined to grant injunctive relief reasoning that Collozzo was not threatened with real and immediate injury because the NCAA had rescinded the

Rule at its recent convention, no similar legislation had been presented or enacted, and no further convention was scheduled for twelve months. *Id.* at 1106.

Section 16 of the Clayton Act authorizes injunctive relief upon a showing of "threatened" injury; plaintiffs need only demonstrate a significant threat of injury from an impending antitrust violation or from a contemporary violation that is likely to continue or recur. *Zenith Radio Corp.,* 395 U.S. at 130, 89 S.Ct. 1562; *accord, United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (court's power to grant injunctive relief survives discontinuance of illegal conduct but moving party must prove "cognizable danger of recurrent violation"). Here, plaintiffs have failed to prove an impending antitrust violation or a contemporary violation that is likely to continue or recur. They argue that a permanent injunction is necessary to restore competition, prevent future violations and inform the NCAA of its obligation not to violate the antitrust laws. They offer no evidence, however, of a cognizable danger that the NCAA is poised to re-enact compensation limits like those found in the Rule. As the Court has previously noted, injunctive relief is unwarranted absent evidence that plaintiffs are presently threatened with loss or damage from action that the NCAA has taken or might take against them. *Schreiber,* 916 F.Supp. at 1106.

In contrast with the circumstances in January of 1996, when the Court did enter an injunction in this case, *see Law,* 1996 WL 104328, plaintiffs point to no real or immediate threat that NCAA members will re-enact the Rule or similar provisions, either at an annual convention or otherwise.[11] The Court has no way of judging whether the NCAA is repentant, or sincerely so, and this line of inquiry is ultimately unproductive because injunctive relief is not designed to extract repentance but to secure compliance. The finding that the NCAA did not withdraw from the conspiracy on May 25, 1995 may hint that the NCAA is predisposed to commit future antitrust violations. That prospect, however, seems remote; if the history of this case proves anything, it proves that the NCAA made a monstrous miscalculation about the costs and the benefits of the Rule. Whether that miscalculation was born of arrogance, inattention, stupidity or even—as it claims—the purest of altruistic motives, is now beside the point. If the NCAA has learned nothing else, it has surely acquired a more informed understanding of its obligations under federal antitrust law. If the NCAA should nonetheless commit future antitrust violations, an appropriate remedy can be fashioned. On this record, plaintiffs have not justified their request for permanent injunctive relief. Accordingly, their motion must be overruled.

### III. Treble Damages

Plaintiffs ask the Court to treble their damages under 15 U.S.C. § 15. The NCAA has no basis on which to object and plaintiffs' motion must be sustained. The Clerk is directed to enter an amended damage award of $36,160,584 in *Law,* $30,584,583 in Hall, and $5,112,177 in *Schreiber.*

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion To Alter Or Amend Judgments* (Doc. # 848) filed May 15, 1998 be and hereby is **SUSTAINED** as to plaintiffs' request for a CPI adjustment of damages and for treble damages, and that the Clerk enter judgments nunc pro tunc in the amount of $36,160,584 in *Law,* $30,584,583 in *Hall,* and $5,112,177 in *Schreiber.* Plaintiffs' motion is otherwise overruled.

11. The Court notes that the NCAA has just concluded another annual convention and that, so far as the record suggests, no movement was afoot to re-enact the Rule or its equivalent.